## <u>AFFIDAVIT OF SPECIAL AGENT TIMOTHY J. QUINN</u>

I, Timothy J. Quinn, being duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have

been so employed for approximately 23 years.

2.      I am currently assigned to the Lakeville Resident Agency within the Boston

Division, where my primary duties involve the investigation of a wide variety of federal criminal

offenses.

3.      During my employment with the FBI, I have conducted and otherwise

participated in hundreds of investigations of violations of federal law, including drug and

weapons-related crimes; financial crimes, including mail, wire, telemarketing, bankruptcy,

securities and insurance frauds; false statement and obstruction of justice-related offenses;

terrorism offenses; and complex computer and Internet-based frauds.  In the course of my work,

I have gained experience in the use of various investigative tools and techniques.

4.      I have personally participated in the execution of dozens of search warrants and

arrest warrants involving a wide variety of local, state, and federal criminal violations.  I have

been an affiant on numerous affidavits for criminal complaints, wiretap intercepts, and search

and seizure warrants for bank accounts, residences, vehicles, cellular telephones and records

from various email and cellular telephone service providers.  As a result of my training and

experience, I have become familiar with the manner in which criminals use computers, email

accounts, cellular telephones and cellular telephone technology, Voice-Over-Internet-Protocol

(VOIP) technology, "spoofing" apps, social media accounts, false and fictitious identities, bank

accounts, virtual currency, "cash apps," and other means to facilitate their illegal activities and to thwart law enforcement investigations.

5.      As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

6.      I am submitting this affidavit in support of a criminal complaint charging Sammy SULTAN, a/k/a Sam Mahmoud SULTAN, a resident of Hayward, California, with making threatening communications in interstate commerce to personnel at the Tufts University Police Department (TUPD) in Medford, Massachusetts on or about May 28, 2021, in violation of 18 U.S.C. § 875(c).

7.      The statements contained in this affidavit are based in part on information provided by various law enforcement personnel; written reports about this investigation that I have received, directly or indirectly, from other law enforcement agents, officers and other witnesses; information gathered from the service of subpoenas and search warrants; the results of physical surveillance conducted by law enforcement agents; independent investigation and analysis by FBI agents and analysts; and my own investigation and experience, training, and background as a Special Agent with the FBI.

8.      This affidavit does not set forth all of the facts developed during the course of the investigation described herein and does not set forth all of my knowledge about this matter. Rather, this affidavit is intended merely to show that there is probable cause to believe that SULTAN violated 18 U.S.C. § 875(c).

## RELEVANT LEGAL AUTHORITY

9.      Title 18, United States Code, Section 875(c) makes it a crime to "transmit[] in interstate or foreign commerce any communication containing any threat to kidnap any person or

any threat to injure the person of another."

## FACTS SUPPORTING PROBABLE CAUSE

### Background

10.     In February 2015, the FBI initiated an investigation of SULTAN for his suspected involvement in making threatening and harassing phone calls (the "2015 Investigation"), similar to those placed to TUPD personnel on May 28, 2021.  I was one of the agents assigned to the 2015 Investigation.

11.     The 2015 Investigation determined that between February 2015 and August 2016, SULTAN, then also a resident of Hayward, California, placed hundreds of obscene and harassing telephone calls to law enforcement agencies throughout the United States, Great Britain, and Canada.  During these telephone calls, SULTAN often asked to speak with female law enforcement staff and then engaged these officers in lengthy conversations, often claiming to have escaped from a mental institution and to be in possession of numerous firearms. On numerous occasions, he claimed to be holding an unknown female hostage in a motel room. During many of these calls, there were audible screams in the background, which SULTAN claimed to be coming from the hostage.  During the course of the 2015 Investigation, I listened to more than twenty hours of calls placed by SULTAN, and also conducted a personal interview of SULTAN. As a result, I am able to recognize SULTAN's voice.

12.     As a result of the 2015 Investigation, SULTAN was charged in November 2017 in the Northern District of California with violating 18 U.S.C. § 875(c) and 47 U.S.C. § 223(a)(1)(c). *See United States v. Sultan*, 4:17-cr-585 (N.D. Cal.).

13.     On December 13, 2017, SULTAN pled guilty to making obscene and harassing phone calls in violation of 47 U.S.C. § 223(a)(1)(c).  In March 2018, he was sentenced to two

years in custody followed by a one-year term of supervised release. SULTAN was released from

prison on June 7, 2019.

### The Tufts Calls

14.     On May 28, 2021, TUPD officers contacted the FBI to report their receipt of a

series of telephone calls to their police emergency and administrative phone lines earlier that

same day.  Based upon a number of similarities between the calls, including the voice of the

caller, the telephone numbers from which the calls originated, and the subject matter of the calls,

TUPD personnel came to believe that all of the calls were placed by the same individual, who

identified himself only as "James." I have since listened to the recordings of these calls, and

recognized the caller in each to be SULTAN. The calls were also consistent with SULTAN's

modus operandi in the calls that were the subject of the 2015 Investigation.

15.     In certain of the calls to TUPD, SULTAN claimed that he had snuck into an

unidentified female's dorm room somewhere on the Tufts University campus.  He claimed to be

a former member of the military "special forces" who had taken "pills," "escaped from a

hospital," and was hiding beneath a bed. He further stated that he possessed an "X26 Taser Gun"

and several "pistols."  On several occasions during the calls, he stated that he intended to use the

taser if the unidentified female whose dorm room he occupied returned to the room and

discovered him hiding beneath the bed.

16.     "James" – i.e., SULTAN – called TUPD eight times between 6:38 a.m. and 8:35

a.m. EDT.[1] In total, the eight calls lasted for more than one hour, during which time TUPD

---

[1] Throughout this affidavit, each time listed is the approximate time EDT, and the time specified
for each call is the approximate time when it commenced.

personnel maintained an active and ongoing dialogue with SULTAN. Six of the calls included

specific threats, which are excerpted below:[2]

  a.     **6:41 a.m.**: SULTAN asked to speak to a "lady officer," said that he had

         entered a room on the Tufts University campus, and then said, "I have a

         lot of weapons;" "If the lady that comes into the room… I'm going to have

         to tase her;" "I'm going to go tase somebody;" "I'm gonna go tase

         somebody now;" and "I'm going to throw the phone away in the toilet and

         I'm going to tase somebody now." During the call, the sound of what

         appeared to be a taser being activated, and a handgun being racked or

         cycled, could be heard in the background. Contemporaneously with these

         sounds being made, SULTAN claimed that the sounds were an X26 taser

         and a pistol.

  b.     **6:54 a.m.**: SULTAN said, "I'm going to tase somebody."

  c.     **7:03 a.m.**: SULTAN said, "I'm going to go tase somebody now" and "If

         the lady comes back into the room, and tries to look under the bed, I have

         to tase her."  During the call, the sound of what appeared to be a taser

         being activated, and a handgun being racked or cycled, could again be

         heard in the background. Contemporaneously with these sounds being

         made, SULTAN claimed that the first sound was an X26 taser, and also

         said he possessed pistols.

---

[2] The two other calls commenced at approximately 6:38 a.m. and 7:02 a.m. On the first, SULTAN asks to speak to a "female officer," but made no threats. On the second, at 7:02 a.m., SULTAN hung up before saying anything.

    d.    **7:25 a.m.**: SULTAN said, "If a lady comes into the room and sees me under the bed, I'll have to tase her;" "I'll tase her and then you'll know I'm telling the truth;" and "I'm going to go tase someone right now." During the call, the sound of what appeared to be a taser being activated, and a handgun being racked or cycled, could be heard in the background.

    e.    **8:16 a.m.**: SULTAN said, "I have a lot of weapons;" "I am going to go tase somebody;" "I have a taser;" and "You'll know what room I'm in when I go tase her."

    f.    **8:35 a.m.**: SULTAN said, "I am going to go tase someone" and "I am going to tase someone."

17.    Despite TUPD's repeated requests for SULTAN to identify his precise location, he refused to do so, although he did at one point state the names of several dormitories on the campus. He appeared to become increasingly angered at questions posed to him by TUPD personnel, threatening on several occasions to terminate the calls and render the phone that he was calling from inoperable by throwing it "in the toilet." SULTAN repeatedly stated that if TUPD personnel attempted to search for him, they would not be able to find him. He also engaged in an extensive discussion with one female officer with whom he spoke about the smell of slippers and shining her shoes, which is similar to other calls SULTAN has made with which I am familiar.

18.    TUPD officers were concerned that SULTAN was serious and intended to commit violence. TUPD Officer 1 subsequently informed the FBI that she was very concerned about the calls while she was speaking with SULTAN (although, as time went on, she began to believe he was not actually on the campus). TUPD Officer 2 subsequently informed the FBI that

he was very alarmed, especially when the caller began naming actual names of buildings located on the Tufts campus and when TUPD Officer 2 could hear what sounded like a taser activating and the slide of a gun racking in the background.

19.     Based upon the calls' nature and the threats of violence, TUPD personnel initiated an immediate effort to trace the incoming calls in order to identify the caller and determine his precise location.  Contemporaneous with those efforts, officers from the TUPD, assisted by local police officers, carried out an hours-long, room-by-room search of numerous buildings located on Tufts University's Medford Campus, several of which SULTAN mentioned by name during his calls.  The search was aided by the use of police K-9 officers. According to TUPD Officer 3, after she sent out a notice to the campus community regarding police activity in the area, she received panicked phone calls from various people all over campus inquiring about the incident and requesting further direction. At one point, TUPD Officer 3 engaged in investigative activities, the results of which suggested to her that the caller was not, in fact, on campus.

20.     Despite their extensive physical search on Tufts University's Medford Campus, investigating officers failed to locate the caller.

## SULTAN Placed the Calls From California

21.     Investigation by TUPD during and after the calls indicated that the calls were made by SULTAN from California using a mobile device, service for which is provided by T-Mobile.

22.     Initially, TUPD traced the calls through caller ID to three telephone numbers that I have identified herein as "TextNow Number 1," "TextNow Number 2," and "TextNow Number 3," because subsequent investigation determined that the numbers were all owned and operated by TextNow, Inc., the developer of a text messaging application, or "app," called "TextNow."

23.     TUPD officers contacted TextNow, Inc. representatives and requested information about the location and identity of the individual(s) associated with TextNow Numbers 1, 2 and 3.  The information provided revealed that TextNow Numbers 1 and 2 were both associated with a Gmail address (rrt101314@gmail.com) ("Google Account 1"). Subsequent investigation also determined that TextNow No. 3 was associated with a separate Gmail address (animalcontrol73@gmail.com) ("Google Account 2").  According to records supplied by TextNow, Inc., TextNow Number 1 was registered on May 25, 2021, three days before the Tufts calls, while TextNow Numbers 2 and 3 were registered on May 28, 2021, the same day as the Tufts calls.

24.     On the same day the calls were made, TUPD officers were also contacted by a Special Agent from the Illinois State Police (ISP).  The ISP Special Agent explained that he was investigating a series of disturbing telephone calls made to the ISP the prior evening by an unidentified individual utilizing TextNow Number 1, and had noticed that the number (TextNow Number 1) also had made calls to TUPD.  As the ISP Special Agent began sharing details of the calls placed to the ISP with TUPD personnel, it became evident to all that the calls placed to both agencies bore a number of similarities, including that the caller claimed to possess a taser and a gun, and threatened to use the taser on anyone who entered the room.  The ISP Special Agent provided TUPD with records he had collected during his investigation, which included records related to TextNow Number 1 and Google Account 1.

25.     The records that the ISP Special Agent received from Google for Google Account 1 revealed that the account was accessed from a specific IP address ("the IP Address") by a mobile device assigned a specific International Mobile Equipment Identification (IMEI) Number

("IMEI Number 1"),[3] with service provided by T-Mobile.

26.     According to records received from T-Mobile, the IP Address itself was

associated with a unique T-Mobile customer account ("T-Mobile Account 1"),[4] and the mobile

device affiliated with T-Mobile Account 1 (the "T-Mobile Device") was the mobile device that

was assigned IMEI Number 1—in other words, the device that was used to access Google

Account 1.  Google records indicated that whoever accessed Google Account 1 did so using only

the T-Mobile Device.

27.     Furthermore, according to Google's records, Google Account 2 was created on

May 28, 2021, and subsequent investigation determined whoever accessed Google Account 2 on

that day did so using only the T-Mobile Device.

28.     Based on the above, I believe that the T-Mobile Device was used to place the calls

to Tufts.

29.     Representatives from T-Mobile also supplied TUPD officials with data

concerning the T-Mobile Device's location.  The location data, which showed the location of the

T-Mobile Device several hours after the calls were placed to Tufts,[5] included geographic

coordinates (*i.e.*, latitude and longitude) that resolved to an address located in Hayward,

California.

30.     I know this address to be SULTAN's residence for the following reasons:

---

[3] Each IMEI number is tied to a specific mobile device in the same way that each VIN number is tied to a specific car or truck.

[4] According to T-Mobile records, T-Mobile Account 1 was activated on April 22, 2021, and was subscribed to by "Pedro Ruiz" of 123 St in Hayward, CA.  Based on a search of law enforcement databases and public records, I believe this address to be fictitious.

[5] Precision location data for the T-Mobile Device during the time the calls were made was unavailable, although cell tower data is available as described below in paragraph 31.

a.    Driver's license records for a person with the same birthdate, Social Security number, and likeness as the person I know as SULTAN lists this address as his residence.

b.    On May 28, 2021, Hayward (CA) Police Department officials visited this address and observed a 2006 Hyundai bearing a specific California registration parked in the driveway. Records maintained by the California Department of Motor Vehicles revealed that this vehicle was registered at the Hayward address to a person identified as SULTAN.

c.    On or about August 13 and 16, 2021, FBI personnel conducted surveillance at the address and on both days observed SULTAN depart from the residence, enter SULTAN's vehicle, and operate it.

d.    On or about August 16, 2021, FBI personnel followed SULTAN while he drove SULTAN's vehicle to various locations around Hayward, California, including a Metro by T-Mobile store, after which he returned to the residence identified above.

e.    When I participated in the execution of a search warrant at the residence on or about October 27, 2021 (see below), SULTAN was present at the residence. A person who identified as SULTAN's close relative informed me that they both lived there, and that SULTAN lived in the residence's garage.

31.    According to T-Mobile records, the T-Mobile Device had extremely limited call/text message activity between April and July 2021. However, calls that were made using the TextNow app would not be reflected individually on T-Mobile records. Furthermore, historical

10

cell site location data obtained from T-Mobile indicates that during the period from April to July
2021, the T-Mobile Device utilized only cell towers located in the area of Hayward, California.
Based on my training and experience, I know that the fact that a mobile device utilizes a
particular cell tower means that the mobile device was likely located somewhere within the
vicinity of that cell tower. Some of the Hayward, California cell towers that the T-Mobile Device
utilized were within a half mile of SULTAN's residence.

32.     The Google records relating to Google Account 1 also included the account-user's
historical internet and web browsing history.  The search history, which spanned the period from
May 25, 2021 through May 28, 2021, revealed that the account-user had conducted searches for
telephone numbers associated with dozens of police departments located in various locations
throughout the United States (although not TUPD). The account-user also appears to have visited
numerous websites and social media pages belonging to several different police agencies located
in various locations throughout the United States.

**Evidence Seized During Search Warrant Execution**

33.     On or about October 27, 2021, pursuant to a federal search warrant issued in the
Northern District of California, I, along with several other agents of the FBI, executed searches
of SULTAN's person, SULTAN's residence and SULTAN's vehicle.

*Evidence Seized from SULTAN's residence*

34.     The garage of SULTAN's residence contained numerous items relevant to the
calls to TUPD, including:

    a.      A taser as well as an invoice from the seller of the taser reflecting the
            taser's purchase by SULTAN. The invoice for the taser is dated May 7,
            2021, and lists SULTAN's name and his address in Hayward, California.

Further investigation determined that the taser was shipped to SULTAN's residence on May 8, 2021.

b.   A Cheetah brand stun gun model number CH-10BLK.

c.   A Samsung Chromebook model number XE310XBA.  This device was unlocked at the time it was seized.  Examination of the screen of the device revealed searches for sounds of puppies crying and pictures of various female law enforcement officers.[6]

d.   A Hewlett Packard Envy Model 15m-es0023dx laptop computer.  Later examination of the computer's contents revealed historical internet search history terms dated on October 3, 2021 for pictures of various female law enforcement officers.

### *Evidence Seized from SULTAN's Person*

34.   When FBI agents searched SULTAN's person, they found two cellular telephones in his pants pocket. Neither phone was assigned IMEI Number 1.  One of the phones was a

---

[6]  In the course of my ongoing investigation of SULTAN, representatives from various animal control agencies located in several states throughout the United States have contacted me regarding dozens of disturbing calls placed to them by an individual whom I believe to be SULTAN.  Many of the calls reported to me occurred in the days and weeks following the execution of the searches of SULTAN's person, SULTAN's residence and SULTAN's vehicle, and those calls remain the subject of ongoing investigation.  I have received records and audio recordings of these calls, and I recognize the voice to be SULTAN's.  During these calls, SULTAN requested to speak with female animal control officers and/or with specific female animal control officers by name.  At times, he threatened to drown puppies he claimed to be in his possession if the call takers did not answer questions he posed, while sounds of puppies crying could be heard in the background.  Some of the calls were sexual in nature and involved SULTAN engaging the call recipients in specific discussion about their feet and fantasy discussions about being restrained, captured and placed in the back of an animal control vehicles.  The calls bear similarities to those that SULTAN placed to TUPD.

Samsung Galaxy Model A11 cell phone ("SULTAN's Samsung Phone") bearing IMEI Number 2.

35.     A subsequent court-authorized search of SULTAN's Samsung Phone was completed by an examiner assigned to FBI's New England Regional Computer Forensics Laboratory, who extracted data from the device for further analysis. Examination of the device, as well as a report that summarizes the data extracted from it,[7] reflects the following:

   a.  The TextNow app was installed on SULTAN's Samsung Phone and was selected as the device's default application for placing outgoing calls.

   b.  Within SULTAN's Samsung Phone were stored account credentials for Google Account 2, the account associated with TextNow Number 3 – one of the numbers used by SULTAN to call TUPD on May 28, 2021. Moreover, SULTAN's Samsung Phone accessed Google Account 2 via the Gmail app installed on the device.

   c.  The phone's internet search history contained entries for several sheriff's offices and searches for various female law enforcement officers.[8]

36.     Based on a review of the call log, I know that SULTAN's Samsung Phone also made three calls to two numbers associated with Arkansas law enforcement agencies: a publicly-listed number for the Ozark (Arkansas) Police Department and another publicly listed number for the Franklin County Sheriff's Office (FCSO), also located in Ozark, Arkansas. I contacted law enforcement officials at FCSO, who provided me with audio recordings of those calls. From

---

[7] Although I do not believe that this was the phone that SULTAN used to call TUPD on May 28, 2021, I believe that the information recovered from it provides additional evidence that SULTAN was the individual who placed those calls.

[8] These search terms do not represent an all-inclusive listing of the items located on SULTAN's Samsung phone, but only a representative sample.

the recordings, I recognized the caller's voice as SULTAN's. Similar to the Tufts calls,

SULTAN stated that he was hiding under a bed, wanted to speak to a "lady officer," had

"nineteen pistols and fifteen X26 taser guns," and was planning to "tase somebody."

### CONCLUSION

37.    Based upon the information described above, I have probable cause to believe that

on or about May 28, 2021, SULTAN violated 18 U.S.C. § 875(c). Accordingly, I respectfully

request that this Court issue a criminal complaint charging SULTAN with this crime and a

warrant for his arrest.

I swear under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.

_____
Special Agent Timothy J. Quinn
Federal Bureau of Investigation

**Mar 31, 2022**

Sworn to before me telephonically pursuant to Fed. R. Crim. P. 41(d)(3) this _____ day of March
2022.

_____
HON. JUDITH G. DEIN
United States Magistrate Judge

14